IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHERI ROQUET, individually and : 
as parent and natural guardian of :
Samuel Brown, a minor, :
                          :
      Plaintiff :
                          :     No. 4:11-cv-01763
    v. :
                          :     (Judge Brann)
JAMES KELLY, III, et al., :
                          :
      Defendants. :

**MEMORANDUM**

October 9, 2013

For the following reasons, the motion to dismiss of defendants Harry

Mathias, Chad Heintzelman, Thomas Sharrow, Sandra Bennett, Jean Dow, and the

Central Columbia School District (June 18, 2012, ECF No. 33) is GRANTED. As

a consequence, the Court declines to exercise supplemental jurisdiction over the

claims against defendants James Kelly, III and Tammie L. Kelly. The Kellys's

motion to dismiss and strike (July 17, 2012, ECF No. 38) and plaintiff Cheri

Roquet's motion for declaratory judgment (Aug. 8, 2012, ECF No. 51) are

DENIED AS MOOT.

## I.      The Complaint

On May 31, 2012, plaintiff Cheri Roquet (hereinafter, "Roquet"), on behalf

1

of her minor son, Samuel Brown (hereinafter, "Sam") filed an amended complaint,

asserting causes of action against Central Columbia School District (hereinafter,

the "school district"), the school district's superintendent, Harry Mathias, Jr., the

principal of Central Columbia Middle School (hereinafter, the "middle school"),

Chad Heintzelman, the middle school's assistant principal, Thomas Sharrow, a

physical education instructor at the middle school, Sandra Bennett, and the middle

school's director of special education/school psychologist, Jean Dow. (See Am.

Compl., ECF No. 32 ¶¶ 6-13 (hereinafter, the "Am. Compl.")).  The Court will

refer to these defendants collectively as the "school district defendants." Roquet

also asserted claims against James Kelly, III (hereinafter, "James"), Sam's

classmate at the middle school, and James's mother Tammie L. Kelly (hereinafter,

"Tammie"). (Am. Compl. ¶¶ 4-5). The Court will refer to James and Tammie

collectively as the "Kellys."

Regardless of the legal merits of her claims, Roquet is rightfully aggrieved

by the calamity that has befallen her son, Sam, at the hands of Sam's classmate at

the middle school, James.[1] According to Roquet, on September 22, 2009, as Sam

and James were reentering the middle school after a session of gym class that had

---

[1]As it must at this stage of litigation, the Court assumes the truth of Roquet's
factual asseverations.

been held outdoors, James threw Sam into a brick wall. (Id. ¶ 49). Attempting to escape from James, Sam fled inside the school building, but James was unrelenting, throwing Sam against lockers and a corridor wall. (Id.). As a result of James's attack, Sam is now paraplegic, amongst other injuries. (Id. ¶¶ 54, 68, 81, 88, 113).

Roquet claims that blame for the attack on Sam extends beyond James to his mother, Tammie, and to the school district defendants as well. In support of this claim, Roquet asserts that, prior to James's attack on Sam, Tammie and the school district defendants were aware that James "had a history of attacking and bullying classmates," including Sam, whom James had bullied for three years previous to the September 22, 2009 attack. (Id. ¶¶ 39-40). Indeed, school records dating from 2007 to the time of the attack show James battering a variety of students on a number of occasions:

- throwing rocks at another boy, hitting the boy in the head and causing injury (Oct. 9, 2007);

- spitting in another student's face (Oct. 19, 2007);

- "body slamm[ing] into a female student" (Oct. 25, 2007);

- throwing paper at another student (Nov. 8, 2007);

- throwing an eraser at another student, hitting the student in the eye (Nov. 15,

2007);

- fighting in gym class (Nov. 21, 2007);

- throwing a snowball at another student (Dec. 6, 2007);

- spitting on another student during gym class (Dec. 10, 2007);

- pushing and hitting another student (Jan. 17, 2008);

- "put[ting] his arm around another student's neck and tr[ying] to pick her up" (Jan. 24, 2008);

- snapping another student in the face with a rubber band (Feb. 25, 2008);

- hitting and pushing another student during gym class (Apr. 3, 2008);

- pushing another student into a wall during gym class (Apr. 7, 2008);

- hitting another student in gym class (Apr. 11, 2008);

- repeatedly grabbing and hitting a girl on her bottom (Apr. 15, 2008);

- spitting water on another student (Apr. 17, 2008);

- grabbing one student and hitting another (Apr. 24, 2008);

- hitting another student in the locker room before gym class (Sept. 29, 2008);

- tackling another student during gym class (Oct. 3, 2008);

- pushing students in the hall (Aug. 31, 2009);

- pulling another student's pants down during recess (Sept. 9, 2009); and

- pushing another student during recess (Sept. 22, 2009).

(Id. ¶ 42). This misconduct is complemented by a number of other infractions in James's school record, including a number of instances in which James used offensive and insulting language towards other students (Oct. 19 & 29 2007; Nov. 8, 2007; Feb. 7, 2008; Apr. 23 & 28, 2008); a time when James brought a live bullet to school (Jan. 7, 2008); a time when James told a classmate he wanted to rape her (Apr. 30, 2008); and other generally disruptive or inappropriate behavior (Oct. 25, 2007; Mar. 31, 2008; May 7 & 14, 2008; Oct. 21, 2008; Dec. 12, 2008; May 27, 2009). (Id.).

In addition to setting forth James's history of violence towards the student body at large, Roquet avers that James had bullied Sam on occasions previous to the September 22, 2009 attack. Roquet asserts that she protested to Tammie and/or the school district defendants about the bullying, although the amended complaint does not reveal the specific nature of her concerns or how often she expressed them. (Id. ¶ 40). One specific instance, however, is included: when the two students were in fourth grade, Roquet requested that they be separated from each other to end James's bullying and harassment of Sam. (Id. ¶ 46).

Roquet contends that, despite knowledge of the aforementioned incidents and of the danger James posed to his classmates, including Sam, "James . . . was permitted by [the] school district defendants to commit unfettered bullying upon

innocent classmates" (Id. ¶ 41), and Tammie "did not discipline [James] or seek to prevent him from further harming or bullying innocent classmates" (Id. ¶ 43).

This is not entirely true, as evidenced by the complaint itself. Although Roquet maintains that the school "permitted" James to engage in "unfettered bullying" of other students, James was regularly, if ineffectively, disciplined for his misbehavior through a combination of in-school suspensions (Oct. 9, 2007; Oct. 19, 2007; Nov. 15, 2007; Dec 6, 2007; Jan. 7, 2008; Jan. 24, 2008; Apr. 15, 2008; May 7, 2008), out-of-school suspensions (Jan. 7, 2008; Apr. 7, 2008), in-school detentions (Nov. 8, 2007; Feb. 7, 2008; Apr. 17, 2008), after-school detentions (Oct. 19, 2007; Oct. 29, 2007; Jan. 24, 2008; Mar. 31, 2008; Sept. 9, 2009), removal of privileges (Oct. 9, 2007; Nov. 8, 2007; Apr. 23, 2008; Apr. 28, 2008; Sept. 9, 2009), make-up classes (Nov. 21, 2007; Dec. 10, 2007), and other measures (Oct. 25, 2007; Jan. 17, 2008; Feb. 25, 2008; Apr. 3, 2008; Apr. 24, 2008; Aug. 31, 2009). (Id.). James's record repeatedly notes that it may be appropriate for the school to notify the police of his conduct (Id.), but it does not appear that this action was ever taken.

In addition, the school district defendants, in cooperation with Tammie, completed an IEP (Individualized Education Program) reevaluation report for James on February 11, 2008. (Id. ¶ 44). The report identified James's behavioral

shortcomings and concluded that "the team"[2] should conduct a "functional assessment" of James and put an "appropriate positive behavior plan" into place. (Id.). The report noted that the team should consider referring James to a outside agency for behavioral support, and should discuss the need for additional mental health services in the middle school. (Id.).

Based on James's functional assessment, which was completed on March 11, 2008, the assessors concluded that James's behavioral challenges included "loosely supervised settings such as lunch or recess, transitions between classes, . . . waiting for . . . task[s] or activit[ies] to begin, large group or lecture formatted classes, poor organization of [teaching] materials, projects or activities [requiring] independent activities[,] and a lack of motivating reinforcement." (Id. ¶ 45). The assessors made a number of corresponding suggestions: provide additional staff support during loosely structured settings or activities; seat James near the classroom teacher and students who model appropriate behaviors; develop a "support plan" for each class; have teachers provide James feedback on his behavior after each of his classes; and develop "reactive strategies" for the classroom, lunch, recess, and during transitions. (Id.).

Notwithstanding these efforts, Roquet contends that the school district

---

[2] See 20 U.S.C. § 1414 for a definition of "IEP Team."

defendants made James's attack on Sam possible because the school district defendants failed to respond appropriately to James's March 11, 2008 assessment (specifically its recommendation to bring James under control in loosely supervised settings); failed to obtain additional behavioral support for James; and failed to respond appropriately to the obvious dangers James posed during gym class. (Id. ¶ 49-50).

In addition, Roquet contends that the school district defendants made James's September 22, 2009 attack on Sam possible in another way. She asserts that the school district defendants were aware that Sam was the frequent target of bullying by his classmates – James and others. (Id. ¶ 47). Indeed Sam's October 9, 2008 IEP reevaluation noted that Sam experienced teasing from other students. (Id. ¶ 48). But despite the school district defendants's knowledge, Roquet contends that "no action was taken to protect Sam[] from . . . bullying and harassment or to assist him with strategies to effectively deal with" bullying and harassment himself. (Id. ¶¶ 47-48). Sam's protests against bullying were, rather, met with discipline directed at him and instruction not to be a "tattletale." (Id. ¶ 47). As a result of the inaction of the school district defendants, Sam was vulnerable prey for James at the time of the September 22, 2009 attack.

Based on these allegations, Roquet asserts seven counts of liability against

the various defendants: (I) common law battery (James only)[3]; (II) common law negligence (Tammie only); (III-V) multiple counts of § 1983[4] liability (school district defendants only); (VI) violations of the Individuals with Disabilities Education Act (hereinafter, "IDEA") and Section 504 of the Rehabilitation Act of 1973 (hereinafter, "Section 504") (school district defendants only); and (VII) violation of the Americans with Disabilities Act (hereinafter, "ADA") (school district defendants only). (Am. Compl. ¶¶ 53-117).

On June 18, 2012 the school district defendants filed a motion to dismiss (ECF No. 33), primarily pursuant to Fed. R. Civ. P. 12(b)(6), and filed a brief in support on July 2, 2012 (ECF No. 36). Roquet filed a brief in opposition on July 16, 2012 (ECF No. 37). The Kellys filed a motion to dismiss (also pursuant to Fed. R. Civ. P. 12(b)(6)) and a motion to strike on July 17, 2012 (ECF No. 38), and filed a brief in support on July 31, 2012 (ECF No. 49). Roquet filed a brief in opposition on August 10, 2012 (ECF No. 52), and the Kellys filed a reply brief on August 21, 2012 (ECF No. 53). Roquet filed a motion for declaratory judgment on August 8, 2012 (ECF No. 51), and filed a brief in support on August 22, 2012 (ECF No. 54). The school district defendants filed a brief in opposition on

---

[3]In paragraph 57, Roquet alleges that Sam's injuries resulted from James's "negligence," but this appears to be a mistake.

[4]That is, 42 U.S.C. § 1983.

September 5, 2012 (ECF No. 55).

## II.    Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 662. The goal behind the standard is to weed out those claims that do not present "enough" factual matter, assumed to be true, "to raise a reasonable expectation that discovery will reveal evidence" in support of the claims. Twombly, 550 U.S. at 556. Where a "plaintiff[] [fails to] nudge[] [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." Id. at 570.

As a matter of procedure, the United States Court of Appeals for the Third Circuit has instructed that,

> after Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [Iqbal, 556 U.S. at 678-79]. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." [Id. at 679].

10

<u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009).

## III. Discussion

### (a) Claims against the School District Defendants

The school district defendants move for dismissal of all of Roquet's claims against them: count III, asserting § 1983 liability for the violation of Sam's Fourteenth Amendment right to bodily integrity under the state-created danger theory; count IV, asserting § 1983 liability for the violation of Sam's Fourteenth Amendment right to bodily integrity under a theory that is not apparent to the Court; count V, asserting § 1983 liability for the violation of Sam's Fourteenth Amendment right to equal protection of the laws; count VI, asserting liability for violations of the IDEA and Section 504; and count VII, asserting liability for the violation of the ADA.

But before the Court takes up any count of the complaint at length, two things should be addressed. First, the Court will dismiss Roquet's count IV for failure to state a claim. Put simply, the Court cannot make out the theory of liability Roquet sets forth in this count. Moreover, Roquet posits that there are only two relevant Fourteenth Amendment due process theories pursuant to which she could assert that the school district defendants are liable for failing to protect one private individual (Sam) from another (James) – the "special relationship" theory

and the "state-created danger" theory – and then admits that one of the two, the "special relationship" theory, does not apply to the facts of this case. (See Pl. Opp'n Br., July 16, 2012, ECF No. 37, at 7 (hereinafter, "Pl. Opp'n Br.")). Roquet's count IV is not based on the "state-created danger" theory. Presumably, then, count IV is based on the "special relationship theory" and, as Roquet admits, fails to state a claim for which relief can be granted.

Second, to the extent plaintiff purports to base § 1983 liability on provisions of Pennsylvania's Political Subdivision Torts Claim Act, 42 Pa. Cons. Stat. § 8541 et seq.,[5] and state Constitution, the attempt fails. Section 1983 does not provide a remedy for violations of state law. D.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1375-76 (3d Cir. 1992) (en banc). Even if it did, the statutory provisions cited by Roquet do not impose liability on the school district defendants or create a cause of action for Roquet; rather, they provide for exceptions to the general grants of immunity supplied to local agencies and their employees in 42 Pa. Cons. Stat. §§ 8541 & 8545.

Accordingly, Roquet is left with recovery under § 1983 and the Fourteenth Amendment pursuant to her state-created danger and equal protection theories

---

[5](See Am. Compl. ¶ 80 (asserting that the school district defendants violated Sam's right to bodily integrity under . . . 42 Pa.C.S.A. § 8550, 42 Pa.C.S.A. § 8542, as well as . . . the Constitution of the Commonwealth of Pennsylvania."))

only, if at all.

### (1) State-Created Danger

The Court will dismiss Roquet's claim based on the state-created danger theory of liability. To proceed with a claim under this theory, Roquet must plausibly allege four elements: (1) the harm to Sam was foreseeable and fairly direct; (2) a state actor (i.e., the school district defendants) acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and Sam existed such that Sam was a foreseeable victim of the state's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor <u>affirmatively used</u> his or her authority in a way that created a danger to Sam or that rendered Sam more vulnerable to danger than had the state not acted at all. See <u>Bright v. Westmoreland Cnty.</u>, 443 F.3d 276, 281 (3d Cir. 2006).

With respect to the fourth element, for better or for worse,[6] recent guidance from the Third Circuit suggests that courts should scrupulously police the line between allegations of "passive inaction" and "affirmative action," even though "the line between action and inaction is not always easily drawn." <u>Morrow v.</u>

---

[6]For the "for worse" point of view, <u>see Morrow v. Balaski</u>, 719 F.3d 160, 196-201 (3d Cir. 2013) (Fuentes, J., dissenting) (criticizing <u>en banc</u> majority for allowing state actors "who let violence run rampant [to] take shelter under the label 'inaction'").

Balaski, 719 F.3d 160, 178-79 (3d Cir. 2013) 178-79 (McKee, C.J., for the en banc majority). While the analysis is sometimes reminiscent of getting lost in a house of mirrors, "the requirement of an actual affirmative act 'is not intended to turn on semantics of act and omission. Instead, the requirement serves . . . to distinguish cases where . . . officials might have done more . . . [from] cases where . . . officials created or increased the risk itself." Id. at 179 (quoting id. at 186 (Ambro, J., concurring in part and dissenting in part)). See also Bright, 443 F.3d at 280-83 (reviewing history of state-created danger theory of liability, and stressing the importance of the affirmative action requirement in light of that history). Ultimately, the Court concludes that Roquet's allegations fall on the losing side of this distinction.

Roquet claims that the school district defendants acted affirmatively in four ways, which the Court will analyze in turn. First, she alleges that the school district defendants "took . . . affirmative action by tolerating and thereby fostering a certain level of violence within the school." (Pl. Opp'n Br., at 11). This fails. By definition, to tolerate violence is to remain passively inactive in the face of it. See Webster's Third New International Dictionary, Unabridged, s.v. "tolerate," accessed Oct. 8, 2013, http://unabridged.merriam-webster.com ("to permit the existence or practice of: allow without prohibition or hindrance: make no effort to

prevent"). To say that the school district defendants fostered violence by tolerating it merely ascribes a consequence to inaction; it does not establish affirmative action.

Second, Roquet alleges the school district defendants "took . . . affirmative action . . . by continually permitting [James] to remain on the school premises when he posed a clear danger." (Pl. Opp'n Br., at 11). This too fails. The plaintiffs in <u>Morrow</u> made essentially the same argument as Roquet, to no avail. In that case, the plaintiffs asserted that "the [state defendants's] affirmative act was suspending [the bully], and then implicitly inviting her to return to school following the suspension. In other words, the Morrows argue that by permitting [the bully] to return to school rather than expelling her, school officials affirmatively used their authority to create a danger that [the bully] would attack Brittany and Emily [Morrow] once again." <u>Morrow</u>, 719 F.3d at 177. Likewise, here, Roquet in substance argues that the school district defendants should have expelled James. Following <u>Morrow</u>, this Court must conclude that the school district defendants's decision to decline to use their authority to expel James does not constitute an affirmative act. <u>Id</u>. at 178 (arguing that, if the court were to hold otherwise, "the state-created danger <u>exception</u> would swallow the rule") (emphasis in original).

Third, Roquet alleges that the school district defendants "took . . .

affirmative action . . . by actively placing Samuel and [James] into the same gym class, despite the long history of bullying." (Pl. Opp'n Br., at 11). This fails because at least since <u>DeShaney v. Winnebago Cnty. Dept. of Soc. Serv.</u>, 489 U.S. 189 (1989), it has been clear that the state's knowledge of danger posed to one individual by another does not require the state to keep the two individuals apart. <u>See id.</u> at 201 (state's decision to return child to custody of abusive father who subsequently severely beat child did not violate due process clause because "[w]hile the State may have been aware of the dangers that [child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them"). <u>See also Morrow</u>, 719 F.3d at 178 (state did not act affirmatively when it "permitted [bully] to board [Morrows's] bus despite knowing about the no-contact orders against [bully]").

Although Roquet alleges that the school district defendants affirmatively "made the decision to place [Sam] and [James] in the same gym class despite the history of violence and despite [his] mother's specific request to keep her son separated from [James]" (Pl. Opp'n Br., at 12), this does not distinguish the case from <u>DeShaney</u>, where the state, after taking temporary custody of the unfortunate child in that case, Joshua, "made the decision" to return Joshua to his abusive father's custody. In the view of the United States Supreme Court, the state's

16

decision to return Joshua left him "in no worse position than that in which he would have been had [the state] not acted at all." <u>DeShaney</u>, 489 U.S. at 201. Here, by failing to respond to James's history of violence and Roquet's separation request (<u>i.e.</u>, by not acting at all), the school district defendants left Sam in no worse position than he would have been in had the danger James posed been completely unknown to the school district defendants and had Roquet never made her request for separation.[7]

Finally, Roquet alleges that the school district defendants "took . . . affirmative action . . . by . . . placing [James] in an unstructured and unsupervised environment thereby rendering [Sam] and other students more vulnerable to danger." (Pl. Opp'n Br., at 11). This also fails. In essence, Roquet argues here that, once the school district defendants learned the results of James's functional

---

[7]This discussion takes into account what the Court believes to be the fair implication of the complaint, <u>i.e.</u>, that the school district defendants were merely carrying out "business as usual" when Sam and James were joined in the same gym class. Were the allegation that it was not within the realm of normalcy that Sam and James should be assigned to the same class, and that the school district defendants pushed Sam from a position of relative safety "into a snake pit" with James, <u>see Morrow</u>, 719 F.3d at 178, then the case could be otherwise.

By the Court's reading of the complaint, Sam had been, and under normal circumstances (<u>i.e.</u>, circumstances not rising to the level of a "state-created danger") could expect to be, placed in class with James. That is, figuratively, the Court's analysis <u>begins</u> with Sam in the snakepit. In this context, Roquet's "specific request" to keep Sam from James sought an affirmative act of the school district defendants – to extricate Sam from danger; the school district defendants's decision to allow Sam to remain in the pit with James was passive inaction.

assessment, they were obligated to implement it. Again, the school district's course of conduct is more reasonably characterized as passive inaction as opposed to affirmative action.

Altogether, Roquet's allegations show that the school district defendants "might have done more" to protect Sam from James, not that they "created or increased the risk itself." See Morrow, 719 F.3d at 179. Accordingly, Roquet's claim pursuant to the state-created danger theory of liability must be dismissed.

### (2)    Equal Protection

The Court will likewise dismiss Roquet's equal protection claim, either because it fails to state a claim for which relief can be granted, or because Roquet has not exhausted the IDEA's administrative procedures. Consisting of just two paragraphs – the first incorporating the previous ninety-two paragraphs of the amended complaint, and the second concluding that "[t]he aforementioned physical assault and abuse which Sam suffered was the result of purposeful discrimination against Samuel by the [school district defendants], who treated Samuel differently from other similarly situated regular education peers in violation of his equal protection rights" (Am. Compl. ¶¶ 93-94) – the claim's precise basis is a mystery. Nevertheless, it seems clear to the Court that Roquet's equal protection claim must be dismissed at this time.

To the extent that Roquet's equal protection claim is – like her claims under the IDEA, Section 504, and the ADA – based on the school district defendants's alleged failure to provide Sam with a free and appropriate public education (hereinafter, "FAPE") (see Pl. Opp'n Br., at 14-20), then the claim is (again, like her claim under the IDEA, Section 504, and the ADA) dismissed for her failure to exhaust administrative remedies under the IDEA. (See infra).

If the basis for the claim is otherwise, then the Court fails to see how Roquet has alleged facts sufficient to show that she has a plausible claim for relief. To sufficiently plead a violation of the equal protection clause, Roquet must allege that Sam received different treatment from other similarly situated individuals or groups. See Tereance D. v. Sch. Dist. Of Philadelphia, 548 F. Supp. 2d 162, 169 (E.D. Pa. 2008). But aside from possibly asserting facts sufficient to support a claim on the basis of a denial of FAPE to Sam, the complaint does not reveal how Sam was treated differently from any other student in any way. To the contrary, the complaint would seem to go some distance towards undermining a charge of discrimination by showing that Sam was just one of many students whom the school allowed James to victimize, albeit with the most tragic of consequences.

Accordingly, Roquet's equal protection claim is dismissed because it fails to state a claim for which relief can be granted and because Roquet has not exhausted

the IDEA's procedures.

### (3)  IDEA, Section 504, and the ADA

The Court will dismiss Roquet's IDEA, Section 504, and ADA claims, not because she has failed to state a claim – an issue upon which the Court expresses no opinion – but because she has apparently failed to exhaust her administrative remedies under the IDEA.[8]

To explain the reasons for this holding, it makes the most sense for the Court to discuss the relevant aspects of the IDEA first. The IDEA is designed, in part, to "ensure that all children with disabilities have available to them a free appropriate public education [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). In the case of

---

[8]The school district defendants assert that Roquet's "IDEA claims must be dismissed for lack of jurisdiction . . . for failure to exhaust administrative remedies." (Def. Supp. Br., July 2, 2012, ECF No. 36, at 24). Roquet does not dispute the assertion that she has failed to exhaust administrative remedies; instead, she argues that "exhaustion of administrative remedies is not required under Section 504, where the relief sought, such as damages, is not available at the administrative level." (Pl. Opp'n Br., at 18).

Technically, the school district defendants's motion to dismiss for lack of jurisdiction is recognized under Fed. R. Civ. P. 12(b)(1) (lack of subject-matter jurisdiction), see also W.B. v. Matula, 67 F.3d 484, 493 (3d Cir. 1995) (IDEA exhaustion is "jurisdictional in nature"), overruled by A.W. v. Jersey City Pub. Sch., 486 F.3d 791 (3d Cir. 2007) (en banc), not 12(b)(6) (failure to state a claim upon which relief can be granted).

disagreement between parents and educators over whether the purposes of IDEA are being fulfilled, the IDEA requires its funding recipients to provide procedures for parents "to present a complaint . . . with respect to any matter relating to . . . the provision of a free appropriate public education to [their] child." 20 U.S.C. § 1415(b)(6). These procedures include a due process hearing and an appeal for "any party aggrieved by the findings and decision rendered in such a hearing." 20 U.S.C. §§ 1415(f) & (g).

Unfortunately for those aggrieved parents who, like Roquet, would prefer to vindicate the rights of their child under IDEA by heading straight to the courthouse, the door is generally closed to anyone who has not first exhausted the procedures set forth in the IDEA. 20 U.S.C. § 1415(i)(2)(A). Worse still, the IDEA provides that:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C.A. § 12101 et seq.], title V of the Rehabilitation Act of 1973 [29 U.S.C.A. § 791 et seq.], or other Federal laws protecting the rights of children with disabilities, <u>except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) [i.e., the due process hearing and appeal] shall be exhausted to the same extent as would be required had the action been brought under this subchapter</u>.

20 U.S.C. § 1415(l) (emphasis added). Which is to say that, if Roquet has failed to exhaust the procedures under IDEA – and she all but admits that she has (Pl. Opp'n

Br., at 18) – then she is not only precluded from pursuing relief under IDEA in this Court at this time; she is also precluded from pursuing relief under Section 504 and the ADA (and the equal protection clause to the extent her claim is based on a denial of FAPE to Sam) if the relief she seeks is likewise available under the IDEA.

Of the various forms of relief requested by Roquet – she seeks "monetary damages, declaratory relief, and reasonable attorneys fees and costs under the IDEA, Section 504, . . . and the ADA" (Am. Compl., at 30) – some are available under IDEA, and some are not. While "compensatory and punitive damages are not an available remedy under the IDEA," Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 185-86 (3d Cir. 2009), "[t]he case law is clear that various forms of equitable relief, including the issuance of a declaratory judgment, can be obtained through the IDEA's administrative proceedings," Hesling v. Avon Grove Sch. Dist., 428 F. Supp. 2d 262, 273 (E.D. Pa. 2006) (Pollak, J.).

In this situation, "[i]n light of the availability of some of the relief sought, exhaustion is required." Id. at 275. See also Falzett v. Pocono Mountain Sch. Dist., 150 F. Supp. 2d 699, 703-06 (M.D. Pa. 2001) (Caputo, J.) (discussing issue at length). Indeed, although the courts have not spoken with one voice on the issue, see Brandon v. Chichester Sch. Dist., 2007 WL 2155722, at *4-*5 (E.D. Pa. July

25, 2007), in the usual circumstance the better rule appears to be to require the plaintiff to exhaust the IDEA's procedures even where she seek monetary damages alone . See Falzett, 150 F. Supp. 2d at 706; Charlie F. v. Bd. of Educ. Of Skokie Sch. Dist. 68, 98 F.3d 989 (7th Cir. 1996) (Easterbrook, J.).

Accordingly, because Roquet has not exhausted the IDEA's procedures, her IDEA, Section 504, and ADA claims cannot proceed in this Court at this time.

**(b)    Claims against the Kellys**

Having dismissed the claims against the school district defendants, the Court will not exercise supplemental jurisdiction over Roquet's state law claims against the Kellys. See Borough of W. Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995) ("[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.").

**IV.    Conclusion**

For the foregoing reasons, the motion to dismiss of defendants Harry Mathias, Chad Heintzelman, Thomas Sharrow, Sandra Bennett, Jean Dow, and the Central Columbia School District (June 18, 2012, ECF No. 33) is GRANTED. As a consequence, the Court declines to exercise supplemental jurisdiction over the

claims against defendants James Kelly, III and Tammie L. Kelly. The Kellys's

motion to dismiss and strike (July 17, 2012, ECF No. 38) and plaintiff Cheri

Roquet's motion for declaratory judgment (Aug. 8, 2012, ECF No. 51) are

DENIED AS MOOT. An Order follows.

BY THE COURT:


    s/ Matthew W. Brann
Matthew W. Brann
United States District Judge